NOT DESIGNATED FOR PUBLICATION

No. 115,408

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT ROBERT BOLLIG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Trego District Court; GLENN R. BRAUN, judge. Opinion filed April 27, 2018. Remanded with directions.

*Daniel C. Walter* and *Aaron J. Herman*, of Walter & Walter, LLC, of Norton, for appellant.

*Natalie Chalmers*, *Amanda G. Voth*, and *Jodi Litfin*, assistant solicitors general, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., ATCHESON, J., and WALKER, S.J.

ATCHESON, J.: A jury in Trego County District Court convicted Defendant Scott Robert Bollig of conspiracy to commit first-degree murder for his principal role in a plot to terminate his girlfriend's pregnancy against her wishes. The other participant in the scheme was a married woman with whom Bollig had an ongoing romantic relationship. On appeal, Bollig has attacked the conviction on multiple grounds, including the legal sufficiency of the State's case, the admissibility of some of the evidence, and the constitutionality of the statute under which he was prosecuted. Given the record on

1

appeal, we cannot say Bollig has shown reversible error on the points he has raised. But the district court made inadequate findings of findings of fact for us to review Bollig's challenge to the search of his smartphone that uncovered incriminating text messages admitted as evidence against him at trial. We, therefore, remand to the district court for the limited purpose of rendering factual findings and supplemental legal conclusions pertinent to the suppression issue. We otherwise retain jurisdiction over this appeal.

FACTUAL AND PROCEDURAL HISTORY

We begin with an introduction of the people involved in or affected by the criminal conspiracy and an outline of the circumstances that drew them together. Bollig, a bank officer, became acquainted with Naomi Abbott in late 2012, while she was married to Rahn Abbott. As her acquaintance with Bollig took an intimate turn, Naomi and Rahn were divorcing. After the divorce, Bollig and Naomi continued in a boyfriend-girlfriend relationship. They agreed they didn't want children together. Naomi already had two young sons.

Although Naomi conscientiously used birth control, she found out on January 6, 2014, that she was pregnant. She told Bollig about the pregnancy, and they discussed options including raising the child, adoption, and abortion. They researched medication abortions in which the woman takes a combination of drugs that essentially induces a miscarriage and surgical abortions in which a physician removes the fetus during a procedure done at a clinic or another medical facility. Bollig adamantly opposed Naomi carrying the pregnancy to term. Naomi testified at trial that she initially leaned toward a surgical abortion but definitely did not want a medication abortion and so informed Bollig. She told the jury that she soon changed her mind about having an abortion. Naomi said she explained to Bollig that she planned to have the child and to move back to Montana where members of her extended family live. According to Naomi, Bollig continued to press her to have an abortion.

2

During that time, unbeknownst to Naomi, Bollig was romantically involved with Angel Abbott, who had married Rahn. Angel was a nurse and, as a result, had more than a passing familiarity with medication abortions.

Bollig regularly used his smartphone to communicate with Naomi and Angel by text messaging. At trial, the State introduced text messages Bollig exchanged with Naomi and with Angel as evidence corroborating both the motive for the crime and the existence of the conspiracy. We offer illustrative excerpts in outlining the underlying facts. On appeal, Bollig has challenged the admissibility of the text messages with Angel as inadmissible hearsay and on the grounds law enforcement officers obtained them through an unconstitutional search of his smartphone. We detail the facts pertaining to Bollig's effort to suppress the messages as a violation of his constitutional rights in our consideration of that legal point.

On January 11, 2014, Bollig and Naomi exchanged text messages:

"B: I just want everything to go back to the way it was. I can't live like this.
. . . .
"N: Yes I do. I miss you & being with you. But you know I can't kill this baby. Things can still be good, it will just be a little different.
"B. No they can't."

About seven hours later, Bollig texted with Angel:

"B: I think your husband should take her some coffee at work.
"A: Why[?]
"B: Add something to it.
"A: He's not going to.
"A: U can't just text me[.] [W]e[']re going to get caught.

3

"B: K."

On January 13, Angel sent Bollig three text messages over the course of two hours: (1) "I mean they will induce[.]"; (2) "Call me when you get a chance. Think I found some stuff[.]"; and (3) "Oxytocin can be used with misopostol [*sic*] [.]"

The next day, Bollig placed an online order with a drug supplier in India for Mifepristone and Misoprostol. The drugs, administered sequentially, are used in medication abortions of early pregnancies. Bollig picked up the shipment at the local post office on January 22. The day after receiving the drugs, Bollig texted with Angel:

"A: I'd say plan 'B'.
"B: Yeah. Can you give her the first set and I can finish?
"A: Yeah[.] [L]et me start being nice & have a talk with her so I can build up a friendship with her[.] I'll start tomorrow cuz I have to work tonight[.] I'll talk to her & see what I can do.
"B: K. She measures 8 weeks 5 days. x-(
"B: This stuff is for 63 days.
"A: Try it[.] [I]f it doesn't work try the oxytocin.
"B: K."

The next Saturday, January 25, Naomi spent the night at Bollig's house. On Sunday morning Bollig made pancakes, and, according to law enforcement officers, he later admitted crushing a tablet of Mifepristone and sprinkling it on the pancakes he gave Naomi. Naomi ate most of the pancakes. On Tuesday, Naomi experienced nausea and spotting that significantly worsened over the next two days. She saw her physician, and he admitted her to the Gove County Medical Center.

Still at the hospital, Naomi miscarried early Saturday morning. A blood test showed she had traces of Mifepristone in her system. A pathologist examined the fetal remains and placenta and noted the condition of the placenta was consistent with Naomi

having ingested Mifepristone. Based on those circumstances coupled with Naomi's denial that she knowingly took Mifepristone, the pathologist classified the miscarriage as a homicide. But he declined to say to a medical certainty the Mifepristone caused the miscarriage, meaning Naomi might have miscarried even without the drug.

Given the pathology findings and Naomi's account, Kansas Bureau of Investigation Agent Kevin Campbell and WaKeeney Police Chief Terry Eberle began investigating possible criminal wrongdoing—the poisoning of Naomi with the design of terminating her pregnancy. On February 19, Campbell and Eberle questioned Bollig at the WaKeeney police station. During the interview, Bollig denied any wrongdoing. He acknowledged his relationship with Naomi and that he knew she was pregnant. He told the officers he and Naomi had researched surgical and medication abortions, leading to his ordering Mifepristone and Misoprostol from an overseas supplier. Bollig told the officers he threw the drugs away after Naomi changed her mind about terminating the pregnancy. During that meeting, the officers executed a search warrant permitting them to seize Bollig's smartphone and personal computer. Bollig also signed consents allowing law enforcement officers to search the information stored in those devices.

According to Naomi, Bollig came over to her house that evening, related his meeting with Campbell and Eberle, and then confessed to her that he had given her Mifepristone to cause her to miscarry. Naomi testified that Bollig said he would tell the officers the truth the next day.

Bollig did return to the police station on February 20 to again speak with Campbell and Eberle. Unlike the day before, Bollig was read his *Miranda* rights. As Eberle later recounted the meeting, Bollig admitted ordering the Mifepristone and Misoprostol and hiding the crushed up Mifepristone pill in pancakes he served to Naomi during the last weekend in January. According to Eberle, Bollig said he intended to give Naomi the Misoprostol three days later but never got the opportunity. Campbell arrested

Bollig at the end of the questioning. Bollig posted bond and was released from custody. He was initially charged with first-degree murder of Naomi's fetus and several less serious charges, including aggravated battery of Naomi.

Months later, a forensic examiner with the KBI studied the information stored in Bollig's smartphone, including the text messages. The messages implicated Angel with Bollig in a plan to induce Naomi's miscarriage. The State amended the charges against Bollig to include conspiring with Angel to commit first-degree murder of the fetus and conspiring with Angel to commit aggravated battery of Naomi.

A jury was impaneled and heard the evidence during a seven-day trial in mid-November 2015. Among the witnesses testifying were Naomi, Eberle, Campbell, the pathologist, other medical doctors, and a pharmacist. Bollig called several witnesses and testified in his own defense. Bollig told the jurors that Naomi intentionally put the Mifepristone in her own pancakes. He also denied telling Naomi he had done so. Bollig testified that during the January 20 questioning at the police station he explained to Eberle and Campbell that Naomi had knowingly put the drug on her own pancakes.

At the conclusion of the evidence, the district court instructed the jury on these charges, and the jury returned verdicts as indicated:

• Intentional first-degree murder for the miscarriage of Naomi's fetus. The jury returned a not guilty verdict.
• Aggravated battery of Naomi based on great bodily harm with lesser included offenses of both domestic battery and battery based on bodily harm for lacing the pancakes with an abortifacient. The jury returned a not guilty verdict.
• Distribution of adulterated food for giving the pancakes to Naomi, a misdemeanor violation of K.S.A. 65-657. The jury returned a not guilty verdict.

6

• Conspiring with Angel to commit intentional first-degree murder by causing Naomi to miscarry and identifying the online order for Mifepristone and Misoprostol as the overt act furthering the conspiracy. The jury found Bollig guilty.

• Conspiring with Angel to commit aggravated battery of Naomi by causing her great bodily harm through the unknowing ingestion of an abortifacient. The district court instructed the jury on lesser included offenses of conspiracy to commit domestic battery based on bodily harm and conspiracy to commit battery based on bodily harm. The online drug order was identified as the overt act. The jury found Bollig guilty of conspiracy to commit domestic battery.

In pursuing the charges for murder and conspiracy to commit murder, the State relied on K.S.A. 2013 Supp. 21-5419 that includes an "unborn child" within the definition of a "person" as used in the statutes criminalizing various degrees of homicide and, in turn, defines "unborn child" as "a living individual organism of the species homo sapiens, in utero, at any stage of gestation from fertilization to birth." The statute, however, expressly excludes from prosecution "[a]ny act committed by the mother of the unborn child" and an abortion performed by a "licensed medical professional at the request of [a] pregnant woman." K.S.A. 2013 Supp. 21-5419(b).

Bollig filed various posttrial motions. The district court granted Bollig's motion to dismiss the guilty verdict on the charge of conspiracy to commit domestic battery as multiplicitous of the guilty verdict for conspiracy to commit intentional first-degree murder. The district court otherwise denied the motions. On the remaining conspiracy conviction, the district court ordered Bollig to serve 117 months in prison, the standard guidelines sentence, to be followed by 36 months of postrelease supervision and ordered restitution to Naomi. Bollig has timely appealed.

Bollig has raised multiple issues on appeal. We have substantively addressed all of them except for the district court's denial of his motion to suppress the text messages obtained from his smartphone. We have remanded that issue to the district court for findings of fact and supplemental conclusions of law. We have chosen to decide the remaining issues in the interests of judicial efficiency and fairness to Bollig.

On appeal, Bollig contends both that the State presented insufficient evidence to support the jury's guilty verdict and that K.S.A. 2013 Supp. 21-5419, a statute integral to the charge and conviction, is unconstitutional. If Bollig were correct on either point, the proper relief would require his outright discharge. To fully address the sufficiency issue, we also have resolved a related evidentiary point Bollig raised on appeal on the admissibility of coconspirator hearsay. We could see no good reason for deferring ruling on those otherwise dispositive points to await findings of fact and conclusions of law from the district court on the suppression issue that, at best, would afford Bollig a new trial. In the interests of efficiency, we have also addressed the substance of Bollig's other appellate issues.

As a result, the present posture of the case is out of the ordinary in that we have decided various issues on the merits but are not in a position to affirm or reverse Bollig's conviction until the district court makes the findings of fact and conclusions of law required on remand.

*District Court Correctly Dismissed Conviction for Conspiracy to Commit Domestic Battery Rather Than Conspiracy to Commit Murder*

Bollig contends the rule of lenity required the district court to dismiss his conviction for conspiracy to commit first-degree murder rather than the conspiracy to commit domestic battery because it is the more serious crime. If the contention were

correct, Bollig should have been sentenced for a class C misdemeanor rather than a severity level 2 felony. See K.S.A. 2013 Supp. 21-5302(d)(1), (f). But the argument misapprehends the rule of lenity and the law governing conspiracies as criminal offenses. Bollig garners no relief on this point.

A conspiracy is an agreement of two or more persons to engage in a criminal undertaking coupled with an overt act performed to further that undertaking. K.S.A. 2013 Supp. 21-5302(a). The undertaking may be a single crime or a course of conduct entailing multiple crimes. The overt act may itself be noncriminal. The agreement need not be formalized in the sense a written contract would be—an informal understanding of and assent to the concerted criminal conduct suffices. *State v. Northcutt*, 290 Kan. 224, 231-32, 224 P.3d 564 (2010) ("'[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances.'") (Quoting *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 [1995]). By their very nature, criminal conspiracies tend to be clandestine, so little, if any, direct evidence of them may be unearthed.

The punishable conduct is the agreement itself—as soon as the agreement has been advanced with an overt act—and not the criminal objective of the conspiracy. The participants, therefore, may be convicted and punished for a conspiracy even though the object crime remains unrealized and no other crimes have been committed. In that respect, the crime of conspiracy reflects a public policy determination to punish persons for confederating to engage in unlawful conduct and then taking a material step to advance the confederation.

Here, the object of the conspiracy was the termination of Naomi's pregnancy without her consent. Bollig and Angel agreed to accomplish that objective by secretly causing Naomi to ingest an abortifacient, effectively inducing a medication abortion. Assuming lacing the pancakes with Mifepristone amounted to a form of battery of

9

Naomi, the conspiracy contemplated two crimes—the objective of terminating the pregnancy (first-degree murder of the fetus) and the means of doing so (battery of Naomi). The objective and the means were not separate agreements or conspiracies but integrated parts of a single conspiracy. They, therefore, constituted one unlawful conspiracy in violation of K.S.A. 2013 Supp. 21-5302 and could be punished only as a single crime under that statute. See *State v. Pham*, 281 Kan. 1227, 1255-58, 1260-62, 136 P.3d 919 (2006).

By charging the objective and the means as distinct conspiracies, the State impermissibly divided a single crime—the agreement to terminate Naomi's pregnancy—into multiple offenses. In turn, that exposed Bollig to multiple punishments for one crime, a violation of the constitutional protection against double jeopardy. 281 Kan. at 1254-55; *State v. Mincey*, 265 Kan. 257, 261-62, 268, 963 P.3d 403 (1998). The two conspiracy charges were, in a word, multiplicitous. The jury verdicts convicting Bollig of separate conspiracies to murder Naomi's fetus and to batter Naomi were the impermissible product of the multiplicitous charges. Bollig could have been found guilty of only one count of conspiracy based on the agreement with Angel as to an object crime and the means of accomplishing that crime. The district court correctly recognized both convictions could not stand. Bollig contends the less serious crime contemplated in the conspiracy should control and, thus, dictate the applicable punishment. Kansas law governing conspiracies is otherwise.

The Kansas criminal code punishes a conspiracy conviction by keying the sentence to "the underlying or completed crime." K.S.A. 2013 Supp. 21-5302(d)(1). A conspiracy to commit an off-grid felony, such as first-degree murder, is a severity level 2 felony, and a conspiracy to commit any other nondrug felony is punished at two levels below the grid level for the agreed upon crime. K.S.A. 2013 Supp. 21-5302(d)(1).

10

When a conspiracy entails an agreement involving multiple crimes, the Kansas Supreme Court appears to look at the principal purpose or object of the agreement as fixing the appropriate severity level and, hence, the presumptive guidelines punishment. In *Pham*, for example, the court found convictions for separate conspiracies to commit kidnapping and aggravated burglary to be multiplicitous because both crimes were components of the agreed upon scheme. The court held that the conviction for the aggravated burglary conspiracy should stand because it reflected the primary goal— obtaining money from the victims at their home. 281 Kan. at 1261-62. Similarly, the court concluded in *State v. Wilkins*, 267 Kan. 355, 367, 985 P.2d 690 (1999), that convictions for conspiracy to commit murder and for conspiracy to commit aggravated robbery were multiplicitous where the agreement was to kill the victim and take his necklace simply as proof of the killing. The court affirmed the conspiracy conviction for murder but offered no explicit explanation for its choice.

In *Mincey*, however, the court found that convicting Mincey of separate conspiracies to commit first-degree murder and aggravated robbery was multiplicitous when she both loaned her van to her son and his friend with the understanding they were going to rob someone and counseled them to kill the victim if necessary to protect their identities. The two robbed a woman in her home and cut her throat, although she survived. The court set aside Mincey's conspiracy conviction for aggravated robbery as impermissibly duplicative of the conspiracy conviction for murder, since they comprised parts of the same criminal agreement. 265 Kan. at 267-68. As outlined in the opinion, the primary objective of the conspiracy was robbery with a contingent component of murder if necessary to avoid detection. Again, the court did not explain why it upheld the conspiracy for murder and reversed the conspiracy for aggravated robbery to resolve the multiplicity problem. The result would logically follow from a rule punishing a conspiracy encompassing multiple crimes by using the most serious agreed upon crime.

11

We need not resolve any apparent analytic tension between *Pham* and *Mincey*. Whether punishment for a conspiracy to carry out multiple crimes turns on the overarching purpose of the confederation or the most serious constituent crime contemplated, the result remains the same for Bollig. The objective of the conspiracy was the termination of Naomi's pregnancy against her wishes, and that criminal purpose constituted an intentional first-degree murder of the fetus—a far more serious crime than any other wrongful act encompassed in the agreement between Angel and Bollig. That disposes of the issue as a legal matter. The district court correctly dismissed the conviction for conspiracy to commit domestic battery as multiplicitous of the conspiracy to commit first-degree murder.

Bollig's reliance on the rule of lenity to say he should be punished for a conspiracy to commit domestic battery is wholly misplaced. First, of course, the Kansas Supreme Court plainly has not applied the lenity doctrine to resolve multiplicity problems arising from separate convictions for different parts of a single conspiracy. Bollig's suggested approach conflicts with the outcomes in *Wilkins* and *Mincey* in which the court looked to the most serious agreed upon crime to define the conspiratorial conduct. It also cannot be reconciled with the explanation in *Pham* that pointed to the "object" or principal purpose of the conspiracy.

Although the rule of lenity has been invoked to resolve some issues arising from multiplicitous convictions, the doctrine doesn't advance Bollig's argument that his conviction for conspiracy to commit murder should have been set aside in deference to his conviction for conspiracy to commit domestic battery. Considered narrowly, the rule of lenity is a canon of construction requiring courts to apply any ambiguity in statutory language in favor of criminal defendants. *State v. Coman*, 294 Kan. 84, Syl. ¶ 5, 273 P.3d 701 (2012). More broadly, however, lenity requires that a criminal defendant be given the benefit when statutes or common-law doctrines appear to allow more than one outcome in a particular factual circumstance. For example, if the appropriate unit of prosecution

12

has not been defined, a defendant should face only one conviction even though his or her conduct entails closely related multiple acts violating the same criminal statute. Lenity thereby avoids a multiplicity problem and a potential constitutional double jeopardy error. See *State v. Coleman*, 47 Kan. App. 2d 658, 671, 277 P.3d 435 (2012). Here, that simply means Bollig can be convicted of and punished for only one conspiracy violating K.S.A. 2013 Supp. 21-5302 evidenced by an agreement to commit multiple crimes—not that the conspiracy must be punished based on the least serious of the agreed upon acts.

Finally, Bollig's suggestion to punish the participants in a conspiracy contemplating multiple criminal acts based on the *least* serious crime cannot be squared with the policy behind criminalizing conspiracies in the first place. If that were the rule, well-informed conspirators would make sure they agreed to commit a misdemeanor theft as part of their scheme. So if Mincey, for example, discussed with her son and his compatriot shoplifting some rope or duct tape to confine the robbery victim, Bollig's rule would punish that conspiracy as a low-grade misdemeanor even though it also contemplated the possible murder of the victim. Bollig's argument may be described as poorly cast in light of Kansas law governing conspiracies.

The district court correctly resolved the multiplicity issue created by the jury's dual conspiracy convictions arising from a single agreement to commit more than one crime in accomplishing an unlawful objective.

*Sufficient Evidence Supported Conviction for Conspiracy to Commit Murder*

Bollig challenges the sufficiency of the evidence to support the jury verdict finding him guilty of conspiracy to commit first-degree murder. He also contends the district court erred in denying his motion for a judgment of acquittal, a request that also turns on whether the State had presented enough evidence to permit a conviction. In reviewing a sufficiency challenge raised on appeal, we construe the evidence in a light

13

most favorable to the party prevailing below, here the State, and in support of the jury's verdict. An appellate court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014); *Pham*, 281 Kan. at 1252. The issue for review is simply whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). A motion for a judgment of acquittal depends upon the same substantive standard: Would the evidence viewed favorably to the State allow the jurors to determine guilt beyond a reasonable doubt? *State v. Taylor*, 54 Kan. App. 2d 394, 412-13, 401 P.3d 642 (2017). Because the district court's ruling on a motion for a judgment of acquittal involves no fact-finding, we consider that ruling as a matter of law and without deference. See *State v. Ta*, 296 Kan. 230, 236-37, 290 P.3d 652 (2012). So functionally and legally, the two points fold into a single sufficiency issue on appellate review. We address them that way.

As we have mentioned, Bollig separately contends the text messages extracted from his smartphone should have been suppressed as evidence because the search that disclosed them violated his constitutional rights. The district court's refusal to suppress the messages presents a different legal issue we address later.

To prove the conspiracy charge, the State had to present evidence from which a reasonable jury could find that Bollig and Angel agreed they would terminate Naomi's pregnancy without her consent and that one of them took a step toward accomplishing that objective. The conspiratorial understanding may be tacit rather than explicit. *State v. Sharp*, 289 Kan. 72, 104, 210 P.3d 590 (2009). The State designated Bollig's acquisition of the Mifepristone and Misoprostol through an online purchase from a foreign country as the overt act taken in furtherance of the conspiracy. The overt act must be done contemporaneously with or after the agreement to commit the object crime. In other words, the overt act may not be carried out before the conspiratorial agreement has been

14

reached. See *State v. Hill*, 252 Kan. 637, 641-42, 847 P.2d 1267 (1993); *State v. Crockett*, 26 Kan. App. 2d 202, Syl. ¶ 4, 987 P.2d 1101 (1999).

Bollig, however, mistakenly contends only evidence of communications or conduct preceding the overt act may be considered in proving the existence of a conspiracy. Rather, the evidence must show the conspiracy existed at the time of the overt act. The evidence may include circumstances occurring after the overt act that shed light on the nature, scope, formation, or execution of the conspiracy. And the evidence may include communications among the coconspirators, subject to the limitations on hearsay. Here, the bulk of the evidence of the conspiracy between Bollig and Angel consisted of their text messages. To assess Bollig's sufficiency argument, we explain why those communications were properly admitted as trial evidence.

Out-of-court statements offered for their truth are hearsay and generally may not be admitted as evidence. K.S.A. 60-460. But the rule excluding hearsay has numerous exceptions. Angel did not testify at Bollig's trial, so the hearsay exception for out-of-court statements of persons present and available as witnesses was inapplicable. See K.S.A. 60-460(a). The hearsay rule, however, includes a specific exception for statements of coconspirators made during and in furtherance of the conspiracy. K.S.A. 60-460(i)(2). If applicable, the exception allows otherwise relevant and admissible out-of-court statements of one coconspirator to be admitted in a trial of a second coconspirator even though the first never appears as a witness.

To take advantage of that exception, the State, however, must offer some trial evidence apart from the hearsay statements themselves to show the existence of a conspiracy. *State v. Butler*, 257 Kan. 1043, 1060-61, 897 P.2d 1007 (1995), *modified on reh'g* 257 Kan. 1110, 916 P.2d 1 (1996). The independent evidence of the conspiracy then triggers the hearsay exception. The discussions of the coconspirators in arriving at the scope and terms of their illegal confederation are considered verbal acts and,

therefore, not hearsay at all. *United States v. Faulkner*, 439 F.3d 1221, 1226-27 (10th Cir. 2006); *Jenkins v. United States*, 80 A.3d 978, 993 (D.C. 2013). Those verbal acts may provide the predicate evidence of a conspiracy. *United States v. Lim*, 984 F.2d 331, 336 (9th Cir. 1993); *Jenkins*, 80 A.3d at 993; *Arguelles v. State*, 842 So. 2d 939, 944 (Fla. Dist. App. 2003). In *Faulkner*, the appellate court appropriated this explanation: "'If three persons are prosecuted for conspiracy, the conversation in which they plan the venture and agree to participate is not hearsay, and the words spoken by each may be proved against all[.]'" 439 F.3d at 1226-27 (quoting Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay,* 12 Hofstra L. Rev. 323, 326 [1984]). The legal significance of those statements lies in their utterance and not in the truth of any asserted facts. As verbal acts, they show the existence of an agreement to accomplish an illicit objective and are admissible for that purpose outside the prohibition on hearsay.

Once the prosecution has made a prima facie showing of both a conspiratorial agreement and an overt act using nonhearsay evidence, it may then rely on the hearsay exception to admit communications among the participants for the truth of the matters asserted to prove details about the promotion and advancement of the agreement. See *State v. Davey*, 306 Kan. 814, 822, 397 P.3d 1190 (2017). As the *Davey* court explained, the coconspirator hearsay exception covers out-of-court statements made by a participant in the conspiracy in furtherance of and during the life of the conspiracy. 306 Kan. at 822.[1]

[1] An example may illuminate the hearsay issues. B texts C: "A and I plan to rob the First National Bank next Tuesday. We need at least three untraceable rifles and three untraceable pistols and a fast getaway car with a top driver. What do you say?" C texts back: "No problem. I can have those things at my place on Sunday. I'm the best wheelman in town." B responds: "K. We're counting on you." Those statements are verbal acts and, thus, not hearsay if offered to show a conspiratorial agreement between B and C and the scope of the agreement. They would be hearsay if offered to prove B actually needs six guns to rob a bank or C is the best getaway driver—the truth of the matters asserted. And it is likely hearsay to prove A's participation in the scheme. But a text message from C to B on Saturday night saying he has acquired the guns and a car

16

does not amount to a verbal act establishing the nature of the conspiracy. If offered for the truth of those assertions, that statement would be relevant to show the progression of the plan and to corroborate overt acts in furtherance of the plan. But the statement would also be hearsay. The admission of the first text messages as a nonhearsay verbal act would provide the requisite factual predicate for the conspiracy, allowing the later text messages to be admitted under the coconspirator hearsay exception.

Here, the January 11 text messages between Bollig and Angel discussing having her husband put an abortifacient in Naomi's coffee compose a verbal act shaping the scope and objective conspiracy. They explore a specific way to terminate Naomi's pregnancy. The January 23 exchange about having Angel ingratiate herself with Naomi to create an opportunity to clandestinely administer the Mifepristone similarly presents a verbal act outlining a plan to accomplish the objective of the conspiracy. The exchanges plainly, if inferentially, show the termination of Naomi's pregnancy to be the object of their concerted action. In turn, their other text messages were admissible and could be considered by the jury as communications between coconspirators. Those messages include discussions between Bollig and Angel about the efficacy of various drugs in inducing miscarriages. The jury had sufficient admissible evidence of an agreement between Bollig and Angel to terminate Naomi's pregnancy against her wishes to support the guilty verdict.

The jury also had sufficient evidence supporting the overt act the State identified—Bollig's online order for Mifepristone and Misoprostol. The State introduced as trial exhibits documents recovered from Bollig's computer showing an order for the drugs and tracking information on shipment. And Bollig admitted placing the order, although he testified at trial he did so at Naomi's direction. Were Bollig's assertion true, his acquisition of the drugs would not have been an overt act furthering the charged conspiracy. As we discuss momentarily, the jury had good reason to discount his explanation.

Viewed favorably to the State, all of that evidence showed the conspiracy preceded the overt act. The evidence, then, supported each element of the conspiracy charge. The State did not have to prove Bollig or Angel actually attempted to carry out their plan by giving Naomi the drugs. But evidence that Bollig tried to do so by lacing the pancakes with Mifepristone circumstantially corroborates the object crime outlined in text messages and, thus, the conspiracy. That evidence also directly supported the first-degree murder charge. During the trial, Bollig, of course, offered a different version of how Naomi ingested the Mifepristone, presenting the jury with a factual conflict to resolve.

In considering the sufficiency of the evidence, we must resolve factual conflicts in the State's favor if reasonable jurors could do so. The jury here could make a reasoned credibility determination that Bollig ordered the Mifepristone and Misoprostol as part of the conspiracy with Angel and later crushed the Mifepristone pill and fed it to Naomi without her knowledge to carry out their plan. First, the January 11 text message exchange between Bollig and Naomi unambiguously shows she intended to carry the pregnancy to term. Naomi's assertion undercuts Bollig's testimony that he ordered the Mifepristone and Misoprostol three days later at her behest. Nothing in the evidence suggested Naomi changed her mind in that time. At trial, Naomi testified she never asked Bollig to order the drugs.

According to the law enforcement officers and Naomi, Bollig admitted in separate conversations with them to secretly putting the Mifepristone in the pancakes. Bollig, of course, denied those admissions. Bollig testified that Naomi put the drug in her pancakes, and he claimed to have told the officers as much when they questioned him. Bollig's testimony essentially meant either he or Naomi and the officers were lying—the conflicting accounts could not reasonably be reconciled as the product of honestly differing recollections.

18

On balance, Bollig's version makes very little sense. Why would Naomi opt for a medication abortion after she had adamantly rejected that idea even when she and Bollig weighed terminating the pregnancy? Why would Naomi have had Bollig obtain drugs for a medication abortion after she told him she intended to have their child? Why would Naomi have asked Bollig to order Mifepristone and Misoprostol from a foreign supplier rather than asking her physician? Why wouldn't she simply take the Mifepristone pill with a sip of water rather than going through some odd ritual with the pancakes? And why wouldn't she later take the Misoprostol, as the protocol for the drugs required?

Those questions lend themselves to no particularly reasonable explanations apart from Bollig's prevarication. The jurors reasonably could have found Bollig to be lying about some or all of what happened. If they concluded he lied about particular material circumstances, they could rely on that conclusion to disbelieve the rest of his account. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014) (Jurors may reasonably conclude that a witness "deliberately false in one claim . . . may have been deliberately false in others."); *State v. Moreno*, 996 A.2d 673, 681 (R.I. 2010) (noting appropriateness of defense counsel's jury argument that a witness false in one thing may be considered false in all things).

In sum, the evidence viewed favorably to the State shows that a reasonable jury could find beyond a reasonable doubt a conspiracy between Bollig and Angel to terminate Naomi's pregnancy by giving Naomi an abortifacient without her knowledge. The evidence also supported Bollig's order for the drugs as the alleged overt act taken in furtherance of the conspiracy. Naomi's ingestion of Mifepristone under suspicious circumstances buttresses the conspiracy, especially in light of the earlier text message in which she told Bollig she had no intention of having an abortion and his expressed displeasure in response. The text message also corroborates Naomi's testimony that she intended to carry the pregnancy to term and that she did not knowingly consume the Mifepristone.[2]

19

[2]The verdict acquitting Bollig of the first-degree murder of Naomi's fetus has no particular legal significance in assessing the sufficiency of the evidence supporting the conspiracy conviction. The jurors heard expert medical testimony that Naomi might have suffered a spontaneous miscarriage unrelated to her unintentional ingestion of Mifepristone. Although that possibility was characterized as unlikely, the expert testimony also established that a measurable number of pregnancies end with spontaneous miscarriages. Naomi consumed some of the Mifepristone and none of the Misoprostol. The evidence may have been sufficient to create a reasonable doubt about the cause of the miscarriage and, thus, to account for the jury's not guilty verdict on the charge of first-degree murder. Conversely, proof of an agreement between Bollig and Angel and his action in ordering the Mifepristone and Misoprostol would have supported a charge of and conviction for conspiracy, even if he never attempted to administer either of the drugs to Naomi.

The trial evidence legally supported the jury's verdict convicting Bollig of conspiracy to commit first-degree murder.

As a separate point on appeal, Bollig has argued the text messages between him and Angel were inadmissible hearsay and the district court erroneously admitted them at trial under the coconspirator exception in K.S.A. 60-460(i)(2). Bollig premises that argument on the lack of independent evidence of a conspiracy, thereby undercutting the admission of all of the statements. We think our discussion here, showing that the hearsay exception applies, disposes of the argument. That is, the State offered text messages between Bollig and Angel that were nonhearsay verbal acts outlining the scope of the conspiracy. Those messages were sufficient to establish a prima facie showing of a conspiracy, thereby permitting the admission of the other text messages under the coconspirator hearsay exception.

We typically review a district court's ruling on the admission of hearsay evidence for abuse of discretion. *Davey*, 306 Kan. at 820. A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK*

20

*Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). Bollig contends the district court applied an inappropriate legal standard, essentially affording us unlimited review of a question of law. See *Davey*, 306 Kan. at 820. Even reviewing the district court's ruling without deference, we see no evidentiary error in admitting the text messages between Bollig and Angel.

*Bollig's Constitutional Challenges to K.S.A. 2013 Supp. 21-5419 Fail*

Bollig attacks his conviction with three arguments that K.S.A. 2013 Supp. 21-5419, criminalizing fetal demise, is unconstitutional and, therefore, unenforceable. He says the statute is impermissibly vague, exceeds the State's police powers with respect to nonviable fetuses, and violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it treats fathers of fetuses less favorably than mothers. We find none of the constitutional challenges persuasive.

Bollig contends K.S.A. 2013 Supp. 21-5419 is impermissibly vague—meaning the statute doesn't give fair notice of what the Legislature has criminalized—because of ambiguities about when "fertilization" of an ovum occurs and whether that differs from conception in defining an "unborn child" as a person for purposes of the criminal homicide statutes. See *United States v. Batchelder*, 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979) (constitutional due process requires criminal statute provide fair notice of proscribed conduct); *State v. Adams*, 254 Kan. 436, 439, 866 P.2d 1017 (1994) (same). He also says there are differing opinions about when life begins and death occurs, leaving jurors to fall back on their own philosophical, moral, and religious views in deciding a case like this and, thus, prompting impermissibly disparate outcomes in legally comparable circumstances.

As we have said, K.S.A. 2013 Supp. 21-5419 effectively places a fetus from fertilization within the definition of a person under the criminal code's homicide statutes. Although Bollig's contentions may have academic or theoretical interest on the assumption the State might attempt to prosecute someone for causing the demise of a recently fertilized ovum, they have no pertinence here. At the time Naomi miscarried, she was eight weeks pregnant. The pregnancy had been medically confirmed, and Bollig knew Naomi was pregnant. Notwithstanding any possible scientific difference between fertilization and conception, Naomi's fetus undeniably came within the meaning of an "unborn child" in K.S.A. 2013 Supp. 21-5419(a)(2).

Under the circumstances, Bollig lacks standing to assert that void-for-vagueness challenge to K.S.A. 2013 Supp. 21-5419 and the resulting scope of K.S.A. 2013 Supp. 21-5402(a)(1), criminalizing intentional first-degree murder, to include fetuses. Those statutes are neither vague nor ambiguous as applied to Bollig. They unquestionably prohibited him from intentionally causing the demise of Naomi's eight week old fetus and, therefore, from conspiring with others to do so. Criminal defendants cannot successfully assert vagueness claims when their conduct obviously falls within the statutory prohibitions even though the statutory language might be ambiguous when applied to certain hypothetical conduct. See *United States v. Williams*, 553 U.S. 285, 304, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008); *State v. Williams*, 299 Kan. 911, 919, 329 P.3d 400 (2014).

Likewise, even if some people philosophically disagree with the idea of criminalizing the demise of a nonviable fetus as a homicide because the fetus isn't sentient or otherwise lacks sufficient attributes of a human being, the statutory proscriptions foster no such legal ambiguity. Jurors need not resort to their personal views of when life begins or when a fetus becomes a person to apply the law in this sort of case. Nor should they. See *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973) (duty of jury to accept and apply law as given in district court's instructions).

22

Debate about whether the demise of a nonviable fetus constitutes the death of a human being in a philosophical or religious sense is similarly irrelevant. The governing statutory language clearly criminalized the objective of the charged conspiracy. Taken together, K.S.A. 2013 Supp. 21-5402(a)(1) and K.S.A. 2013 Supp. 21-5419 unambiguously proscribe what the State alleges Bollig conspired to do by agreeing to terminate Naomi's pregnancy against her wishes. We do not understand Bollig to be arguing otherwise. Accordingly, the void-for-vagueness arguments fails.

Bollig next argues that the State exceeded its constitutional authority by criminalizing conduct resulting in the demise of a fetus that has yet to become viable. The argument depends upon extending a woman's substantive due process right to terminate her own pregnancy to a third party who intentionally acts to kill a fetus contrary to the woman's wishes—a strange constitutional misappropriation, to say the least. Bollig extracts language from *Roe v. Wade*, 410 U.S. 113, 163-64, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), recognizing the State's limited rights with respect to fetuses before viability, but he fails to acknowledge the broader constitutional discussion of which that language is merely one part. In *Roe*, the Court balanced a woman's due process right to terminate her own pregnancy with the State's interests in regulating abortion procedures to insure the woman's safety and in protecting "fetal life after viability" notwithstanding the woman's right. The woman's constitutional right predominates over the State's interest with respect to fetuses that have not reached viability. 410 U.S. at 163-64.

Nothing in *Roe* or later reproductive rights cases suggests the sort of transposition Bollig makes here to shield his conduct in conspiring to terminate Naomi's pregnancy against her will. We assume the State can in some fashion criminalize that conduct, so long as the means used do not otherwise unduly burden a woman's due process right to reproductive freedom. See *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, 136 S. Ct. 2292, 2309, 195 L. Ed. 2d 665 (2016) (state regulations may not "impose an undue burden" on woman's constitutional right to abortion). Whether K.S.A. 2013 Supp. 21-

5419 satisfies that constitutional directive is not properly before us, since Bollig has no legal basis, *i.e.*, standing, to assert Naomi's due process right to voluntarily choose to terminate her own pregnancy to upend his conviction and punishment for conspiring to terminate her pregnancy against her wishes. The inherent contradiction in the proposition is self-defeating:  Bollig cannot invoke Naomi's right to make a choice about continuing her pregnancy to shield his deliberate conduct intended to deprive her of that very choice. Nor can he abstractly claim the protection extended to any hypothetical pregnant woman under K.S.A. 2013 Supp. 21-5419 to thwart his prosecution and conviction. See *Warth v. Seldin*, 422 U.S. 490, 499-500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) (Parties generally "must assert [their] own legal rights and interests, and cannot rest [a] claim to relief on the legal rights or interests of third parties.").[3]

[3]In a few limited circumstances, the courts relax standing requirements to allow a litigant to assert the rights of a nonparty when the two are closely allied in legal interest. So, for example, physicians who perform abortions have been permitted to assert constitutional arguments based on the due process rights of their current or potential patients. See *Singleton v. Wulff*, 428 U.S. 106, 114-18, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976); *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 921, 128 P.3d 364 (2006); *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013). Bollig and Naomi have no such community of interest here that would allow him to base a claim on her rights.

Finally, Bollig contends K.S.A. 2013 Supp. 21-5419 violates the Equal Protection Clause of the Fourteenth Amendment by shielding a pregnant woman from criminal liability for her actions causing a miscarriage or fetal demise without comparable protections for the father of the fetus. Bollig characterizes the difference in treatment as an impermissible form of sex discrimination. He has misframed the equal protection issue and, as a result, comes to an erroneous conclusion.

The Equal Protection Clause prevents state and local governments from treating groups of people differently, whether through legislative enactment or other policies and practices, without some justification. See *Reed v. Reed*, 404 U.S. 71, 75-76, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971) ("The Equal Protection Clause . . . den[ies] to States the power to

24

legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute."); *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, 123, 853 P.2d 669 (1993) ("[E]qual protection requires . . . that legislative classifications be reasonable, not arbitrary, and that they be justified by legitimate legislative objectives."). The courts have recognized the government's use of sex or gender as a characteristic in parceling out benefits or imposing burdens offends the Equal Protection Clause unless the classification substantially advances an important governmental interest. *Craig v. Boren*, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 397 (1976); *Hassan v. City of New York*, 804 F.3d 277, 299-300 (3d Cir. 2015).

Here, the difference in treatment under K.S.A. 2013 Supp. 21-5419 that Bollig cites simply takes account of and seeks to preserve the fundamental constitutional right extended to pregnant women in charting the course of their pregnancies. That is an entirely proper governmental objective and does not result in a classification lacking a legally appropriate justification. Moreover, the protection in K.S.A. 2013 Supp. 21-5419 does not create a gender-based benefit, since it applies to a woman only with regard to her own pregnancy. The classification in K.S.A. 2013 Supp. 21-5419, therefore, does not violate the Equal Protection Clause.

Bollig's argument first rests on a faulty understanding of the legal basis for the statutory exemption extended to the pregnant woman in K.S.A. 2013 Supp. 21-5419. As we have said, a woman has a substantive due process right to terminate her pregnancy, subject to certain limitations after the fetus has become viable. But the State may not impose undue burdens on the woman's exercise of that fundamental right. See *Whole Woman's Health*, 136 S. Ct. at 2309-10.

The Legislature presumably sought to insulate K.S.A. 2013 Supp. 21-5419 from an undue burden challenge from a woman seeking an abortion by providing the

25

exemptions for the pregnant woman and medical professionals performing surgical or medication abortions. See K.S.A. 2013 Supp. 21-5419(b) (outlining exemptions). Obviously, criminalizing abortion services or the actions of a pregnant woman to facilitate the termination of her own pregnancy would unconstitutionally burden a woman's due process right to reproductive freedom, including having abortions. The exemptions, then, reflect a legislative effort to craft a constitutional statute criminalizing fetal demise caused by third parties unassociated with a woman's decision to have a surgical or medication abortion or who, as the State alleged in this case, act contrary to a woman's intent to continue her pregnancy.

The substantive due process right to decide whether to have an abortion has never been extended to the father of the fetus. The decision, as a matter of constitutional law, has been reserved solely for the mother. See *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 68-69, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976) (finding unconstitutional statutory requirement woman obtain consent of husband before getting abortion); cf. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 896-98, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (finding unconstitutional statutory requirement woman notify husband of intention to get abortion). In both *Danforth* and *Casey*, the Court presumed in most instances the husband would be the father of the fetus and, nonetheless, found no legal basis to require a woman to obtain consent from or even notify her husband that she intended to get an abortion. Those decisions recognize that fathers, as measured against mothers, simply do not have a similarly compelling constitutional interest in whether a pregnancy is continued to term. See *Casey*, 505 U.S. at 896 (recognizing mother has materially greater liberty interest than father in decisions affecting pregnancy and childbearing since they impose "upon the very bodily integrity of [a] pregnant woman"). The distinction K.S.A. 2013 Supp. 21-5419 draws between mothers of fetuses, by according them an exemption from the criminal proscriptions for causing fetal demise and fathers, who have none, simply mirrors their respective

26

constitutional interests and, therefore, does not amount to impermissible line-drawing offending the Equal Protection Clause.

The second problem with Bollig's argument plays off the first deficiency. The classification drawn in K.S.A. 2013 Supp. 21-5419 is not based on sex or gender. The exemption in K.S.A. 2013 Supp. 21-5419 applies to a pregnant woman and actions she takes with regard to her own pregnancy. No one else may claim that exemption—not the father, not men generally, or other women generally. Angel faced criminal liability based on K.S.A. 2013 Supp. 21-5419 in the same way Bollig did. And she would have been just as liable had she conspired with another woman rather than Bollig to cause Naomi to miscarry. Thus, K.S.A. 2013 Supp. 21-5419 does not parcel out its benefit (an exemption from prosecution) based on sex but on the more narrow fundamental right of a woman to control her own reproductive freedom. Although only women may obtain that benefit, only one woman can in any particular case. The classification, therefore, does not rest on sex as the governing criterion. Accordingly, Bollig has not presented a sex-based equal protection violation.

Bollig has failed to articulate grounds on which K.S.A. 2013 Supp. 21-5419 might be unconstitutional as applied to him in this prosecution or on which his conviction for conspiracy to commit murder might be constitutionally infirm.

*District Court Made Insufficient Findings Bollig Consented to the Search of His Smartphone, Requiring Remand for Findings and Supplemental Legal Conclusions*

On appeal, Bollig contends the district court erred in denying his pretrial efforts to suppress his text messages with Angel that law enforcement officers recovered during a search of his smartphone. Bollig reprises dual arguments he presented to the district court: (1) He was impermissibly induced to give consent for the search and, therefore, did so involuntarily; and (2) government agents did not execute a search warrant for the information stored in smartphone within 96 hours, rendering the warrant void under

27

K.S.A. 2013 Supp. 22-2506(a) and the search impermissible. In the district court, Bollig raised a wider array of suppression issues covering a broader range of evidence. The district court held several hearings on those issues, including the voluntariness of Bollig's written consents to search both his smartphone and his personal computer, and denied relief in exceptionally terse bench rulings that for the most part included neither credibility determinations nor any other formal findings of fact. In reviewing the issue, we have the district court's ultimate legal determination that Bollig voluntarily signed a consent for the search of his smartphone coupled with the evidentiary record compiled in the pretrial hearings but next to nothing from the district court bridging the two.

Although a district court's failure to make detailed or complete findings does not automatically preclude appellate review, the absence of virtually any factual determinations precludes us from making a meaningful assessment of the voluntariness of Bollig's consent to search his smartphone. Ordinarily in reviewing a ruling on a motion to suppress, we would apply a bifurcated standard giving deference to the district court's findings of fact so long as they had support in the evidence and then making an independent determination whether those findings warranted the district court's legal conclusion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The State bears the burden of proving a search or seizure to be constitutionally permissible by a preponderance of the evidence. *Patterson*, 304 Kan. at 272; *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008).

As we explain, there are material conflicts in the testimony from Bollig, on the one hand, and the law enforcement officers who obtained the written consent, on the other, bearing on the voluntariness of the consent. Because the district court failed to address, let alone resolve, the conflicts, we believe prudence requires a remand for additional fact-finding and supplemental legal conclusions allied with those findings. See *State v. Neighbors*, 299 Kan. 234, 240-41, 328 P.3d 1081 (2014) (remand for additional findings if issue cannot otherwise be resolved on appeal); *Fischer v. State*, 296 Kan. 808, 825, 295

28

P.3d 560 (2013) (district court has "primary duty to provide adequate findings and conclusions" and appellate court may remand for "additional findings and conclusions").[4]

[4]In this case, the district court effectively abandoned its duty to make pertinent findings. Under the circumstances, we decline to rely on the presumption that a district court has implicitly made all findings necessary to support its ruling. See *Neighbors*, 299 Kan. at 240 (noting presumption). The presumption may be appropriately applied when the district court explicitly makes findings of fact but fails to affirmatively articulate one or more important or necessary findings and the party against whom the ruling has been entered makes no request for additional findings. Here, neither the State nor Bollig suggested to the district court that it should make at least *some* findings to support its legal conclusion upholding the validity of the consent to search. We remand for that purpose rather than invoking the presumption to supersede entirely the district court's obligation to sort and weigh conflicting relevant evidence, including contradictory testimony implicating witness credibility. We cannot make those determinations from a transcript and, therefore, cannot meaningfully review the issue. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012) (remand appropriate when "the lack of specific findings" stymies appellate review).

To guide the district court, we outline some applicable legal principles, summarize the record evidence, and provide direction as to tasks remaining on remand.

A government agent's search of the information a citizen retains on his or her smartphone implicates the Fourth Amendment and typically requires a judicially issued warrant. See *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2485, 189 L. Ed. 2d 430 (2014). But a legally valid consent to search obviates the need for a warrant. *State v. Parry*, 305 Kan. 1189, 1195-96, 390 P.3d 879 (2017) (recognizing consent as among exceptions to Fourth Amendment's warrant requirement). Broadly speaking, the credible evidence must show a consent to be unequivocal, specific, and freely given—meaning uninfluenced by implied or express coercion or duress or by false promises of material benefits. *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015); *State v. Thompson*, 37 Kan. App. 2d 589, 596, 155 P.3d 724 (2007). The voluntariness of a given consent presents a question of fact dependent upon how a reasonable person would have

perceived all of the circumstances. The test also has been framed in terms of the freedom to give a negative response to the government agents' request: Would a reasonable person have felt free to refuse to consent to the search? *State v. Spagnola*, 295 Kan. 1098, 1107, 289 P.3d 68 (2012).

The courts have recognized indicia to be considered in weighing whether an encounter between government agents and an individual is voluntary or impermissibly coercive. Those factors, likewise, bear on the voluntariness of a consent to search given during such an encounter. 295 Kan. at 1108; *State v. Thompson*, 284 Kan. 763, 812-13, 166 P.3d 1015 (2007). They include the location of the encounter, the number of officers involved, the tenor of the questioning, the display of weapons or other potentially intimidating conduct, any physical contact, and the individual's reasonable perception that he or she could leave or communicate with third persons. *Spagnola*, 295 Kan. at 1108; *Thompson*, 284 Kan. at 811. Government agents may also impermissibly induce consent with deceptive promises of leniency or other benefits in contrast to coercive invocations of actual or implicit threats of harm. See *Thompson*, 37 Kan. App. 2d at 596; *United States v. LeBeau*, 867 F.3d 960, 971 (8th Cir. 2017) (voluntariness of consent dependent upon totality of circumstances, including whether government agents "falsely promised something"); *United States v. Carloss*, 818 F.3d 988, 998 (10th Cir. 2016) (consent voluntary where, among other things, evidence showed law enforcement officers "us[ed] no threats or promises"). Persons agreeing to searches may limit the scope of their consent and, thus, the resulting search. And they may later withdraw their consent. *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) (consent to search may be limited in scope); *State v. Ryce*, 303 Kan. 899, Syl. ¶ 7, 368 P.3d 342 (2016) ("consent may be revoked or withdrawn at any time before the search has been completed"), *aff'd on reh'g* 306 Kan. 682, 392 P.3d 711 (2017).

The district court took up Bollig's motion to suppress the information recovered from his smartphone well after evidentiary hearings on other pretrial matters. The

prosecutor and Bollig's lawyers agreed the district court could consider the testimony and other evidence received during the preliminary hearing and a hearing on an earlier motion Bollig filed to suppress as involuntary statements he made during the February 19 and February 20 meetings with Campbell and Eberle. See *State v. Betancourt*, 301 Kan. 282, 289, 342 P.3d 916 (2015) (noting that "at a *Jackson v. Denno* [378 U.S. 368] hearing, the issue before the court is whether defendant's statement or confession was voluntary"). Bollig signed the disputed consent to search his smartphone at the first of those meetings.. The district court had already denied Bollig's motion to suppress the statements he made. As we discuss, the district court's ruling on that motion included only one limited factual finding potentially bearing on the voluntariness of Bollig's consent to search his smartphone. At the hearing on the motion to suppress the information obtained from Bollig's smartphone, the parties augmented the extant district court record with testimony focused on voluntariness. We summarize the evidence presented to the district court on the issue.

Eberle called Bollig at the bank the morning of February 19, 2014, and asked him to come to the police station to provide some information about Naomi's miscarriage. Bollig told Eberle he was quite busy. Eberle then offered to go to the bank. Bollig said he needed to wrap a couple of things up and would be over. About 15 minutes later, around 10:30 a.m., Bollig arrived at the police station. Eberle met Bollig in the lobby and immediately escorted him into the police station. They went to Eberle's office. Eberle introduced Bollig to KBI Agent Campbell, who was waiting there. As we have indicated, Bollig was employed as an assistant vice president and loan officer at a local bank. Bollig testified he has two associate degrees from postsecondary schools.

After closing the office door, Campbell and Eberle questioned Bollig for about an hour and 45 minutes. Campbell asked most of the questions. Bollig was not handcuffed or physically restrained in any way. The officers neither told Bollig he was under arrest

nor otherwise suggested he could not leave. But they did not affirmatively tell him he could leave if he wanted to. Bollig was not informed of his *Miranda* rights.

The office was small, so all three were relatively close physically. Eberle wore his uniform, including a duty belt on which he had a handgun. Campbell had on plainclothes and carried a handgun, although the record is less than clear about whether his sidearm was visible. Neither officer otherwise displayed or brandished a weapon. Bollig testified that at one point Eberle rolled his chair close and put his hands on Bollig's knees to punctuate an exhortation to tell the truth about what happened to Naomi. Eberle agreed that he briefly moved his chair closer to Bollig but denied that he or Campbell touched Bollig during the questioning. Bollig testified that he concluded the door was locked because several times that morning Eberle got up to open the door when someone knocked. Eberle and Campbell testified the door was unlocked.

The record evidence indicates Bollig never asked to take a break or to make a telephone call, let alone leave. By all accounts, the questions were posed in a civil businesslike manner, and the responses were made in kind. The officers, however, did not make a verbatim video or audio recording of their examination of Bollig.

Partway through the meeting, Campbell asked about Bollig's smartphone and requested to see it. Bollig gave the phone to Campbell, who then held on to it. Bollig testified he relinquished the smartphone reluctantly. After Bollig asked for his smartphone back several times without success, Campbell displayed a search warrant permitting the seizure of the smartphone. The questioning continued.

Shortly after noon, Bollig indicated he would consent to a search of his smartphone. He signed a written consent at 12:19 p.m. Both Eberle and Campbell signed the consent as witnesses. The written consent permits the KBI and other law enforcement officers to "view any and all electronic data" on the smartphone, which is identified by its

32

make, model, and assigned number. The form includes acknowledgements that the person asked to give consent understands he or she may refuse to sign, that no promises or threats have been made to obtain consent, and that the consent once signed may be "withdraw[n] . . . at any time." At the suppression hearing, Bollig testified that Campbell told him if he signed the consent, the smartphone would be returned to him the next day. He also said the officers promised him that if he cooperated, nothing would happen to him. Bollig testified he signed the form because of those representations. Campbell and Eberle testified generally they made no promises or threats to Bollig.

A few minutes after signing the consent for the smartphone, Bollig signed a separate consent allowing a search of his personal computer. Bollig has not challenged the search of the computer as a point on appeal, and that signed consent form is not part of the record.

After Bollig signed the consent forms, he, Eberle, and Campbell walked about half a block to his house, so the officers could take custody of his personal computer. All three of them returned to the police station in 10 minutes or so. Eberle made copies of the consents and other paperwork. Bollig then left the police station.

The next morning, Bollig called Eberle and said he wanted to talk further about the circumstances of Naomi's miscarriage. Eberle and Campbell indicated Bollig initiated the second meeting of his own accord and without any prompting. Bollig testified that before he left the police station on February 19, Eberle told him he needed to call or come back the next day.

In any event, on February 20, Bollig returned to the police station where Campbell and Eberle again spoke with him. The substance of the questioning on February 20 has no direct bearing on the suppression issue before us. During that meeting, the officers arrested Bollig for the homicide of Naomi's fetus. Bollig was booked and later released

on bond. During the suppression hearing, the parties agreed law enforcement officers obtained a warrant on April 9 to search Bollig's smartphone and that between October 1, 2014, and February 27, 2015, a KBI employee extracted the stored text messages and other information from the phone.

We cannot readily measure the voluntariness of Bollig's written consent to search from this record, since we are not in a position to make credibility determinations and there are materially conflicting accounts of what happened on February 19. See *Franco*, 49 Kan. App. 2d at 936-37 (Appellate courts do not make credibility determinations because they have no opportunity to assess the demeanor and comportment of witnesses as they testify under oath and, in particular, as they respond to cross-examination.). The district court, as the fact-finder in the suppression hearings, had the opportunity to see and hear the witnesses as they testified—a circumstance that may materially affect credibility assessments. See *United States v. Owens*, 789 F.2d 750, 756 (9th Cir. 1986), *rev'd on other grounds* 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). In theory, we could *assume* all of the disputed material facts to be as Bollig portrayed them and then attempt to decide the issue of voluntariness as a matter of law. See *Patterson*, 304 Kan. at 274; *State v. James*, 301 Kan. 898, 908, 349 P.3d 457 (2015). We decline that approach in this case both as unduly preemptive of the district court's role as the finder of facts and as potentially blurring the distinction between factual findings and legal conclusions when it comes to voluntariness. The better course requires remand to the district court for the necessary factual findings and related legal conclusions.

In ruling on the motion to suppress the text messages, the district court simply incorporated by reference the earlier findings it made in denying the motion to suppress Bollig's statements to Eberle and Campbell during the questioning on February 19 and February 20. The district court discussed only two disputes in the evidence in its bench ruling regarding the statements.

34

First, the district court perceived a conflict in Eberle's and Bollig's account of their telephone call the morning of February 19. The district court indicated Bollig testified that Eberle both offered to come to the bank to question him and suggested the appearance of law enforcement officers there would be embarrassing to Bollig. The district court indicated Eberle "said that didn't happen." But the record shows Eberle testified that he did tell Bollig he would be willing to come to the bank. Eberle did not testify one way or the other about characterizing such a visit as potentially embarrassing to Bollig. The district court specifically declined to resolve the discrepancy because in its view neither version would have contributed to the questioning at the police station being overbearing or coercive.

Second, the district court concluded the door to Eberle's office was not locked when the officers questioned Bollig on February 19 and obtained the signed consent to search. As we noted, there was conflicting evidence on the point. The district court discounted Bollig's deduction the door was locked. The district court suggested the individuals knocked before entering not because the door was locked but as a matter of etiquette and deference to a *closed* door. But that explanation fails to account for Bollig's undisputed testimony that Eberle got up and opened the door rather than simply asking the individuals to enter. Eberle's actions permit the inference the door may have been locked.

The locked-unlocked discrepancy doesn't appear to be particularly probative of the voluntariness of the consent for a couple of reasons. Bollig did not testify that Eberle used a key to open the door, so anyone inside the office apparently could have left without assistance. That undercuts the idea the "locked" door had trapped Bollig or otherwise materially contributed to a coercive environment. Moreover, Bollig specifically testified he signed the consent because he was promised his smartphone would be returned the next day and that nothing bad would happen to him if he cooperated. He did not claim he signed because his will had been broken by a threatening or coercive

35

atmosphere from which he felt unable to escape or in which he felt his physical safety was in jeopardy.

On remand, the district court should consider the evidentiary record the parties designated at the hearing on Bollig's motion to suppress the information obtained from his smartphone and the testimony and documents presented during that hearing. The remand is not intended to allow the parties to expand the evidentiary record. In its discretion, the district court may invite supplemental written or oral argument from the parties before making additional findings of fact and any related conclusions of law. The parties, however, should not presume to submit uninvited argument to the district court.

Points for the district court's consideration on remand include:

• Resolution of the conflicting testimony about promises made to Bollig on February 19. Bollig testified that he signed the written consent to search because Eberle and Campbell told him nothing would happen to him if he cooperated and that his smartphone would be returned to him promptly if he consented to the search. The officers denied making any promises or threats to Bollig. This sort of conflict presents a quintessential credibility determination for the fact-finder and entails a probative point on the issue of voluntariness.

• If the district court were to find the officers more credible than Bollig on that point, meaning no such promises were made, the district court should assess whether a reasonable person in Bollig's position would have otherwise found the circumstances of the questioning on February 19 so oppressive that signing the consent to search would have been involuntary. Although Bollig did not expressly argue the written consent was the product of an impermissibly coercive interrogation, he did advance that argument in his earlier motion to suppress the statements he made to the officers. If the district court finds the environment were not impermissibly coercive, the district court should then

36

make corresponding conclusions as to the voluntariness of Bollig's consent to the search of the smartphone and, in turn, the admissibility at trial of the text messages retrieved from the phone.

• If the district court were to find Bollig more credible than the officers with regard to either or both of the promises, then the district court should identify the credible representation or representations and determine whether Bollig was thereby induced to sign the consent when he otherwise would not have done so. See *Franco*, 49 Kan. App. 2d at 930 (fact-finder may believe some parts of witness' account and disbelieve other parts). If the district court finds either or both promises did not cause Bollig to sign the consent to search his smartphone, then it should determine whether the credible promises in conjunction with the overall atmosphere of the February 19 encounter caused him to do so.

• On remand, the district court obviously is not bound to the ultimate conclusion it previously reached on Bollig's motion to suppress the text messages. Were that true, we would be orchestrating an empty exercise. The district court also may revisit the limited factual findings it adopted in deciding the motion. If the district court were to conclude on remand Bollig did not voluntarily sign the consent to search—because of improper promises, an impermissibly coercive environment at the police station, or a combination of the two—then the district court should determine the resulting legal effect. And in doing so, the district court may address any other relevant factual considerations or conflicts we have not expressly mentioned. Without looking at the search warrant as an alternative basis for the State's use of the text messages as evidence against Bollig, the district court should determine whether an involuntary consent would require suppression of the text messages and, if so, whether their admission at trial could be excused as harmless error. Although those determinations may seem superficially straightforward under the circumstances, they are the district court's to make in the first instance.

37

In addition to this opinion, we have entered a brief order remanding this consent issue to the district court for the purpose of making additional findings of fact and supplemental conclusions of law. After the district court has made those determinations, we will review the augmented appellate record and, if necessary, request further briefing from the parties. We intend to prepare a short opinion addressing the remaining appellate issues bearing on Bollig's motion to suppress the text messages in light of the district court's additional findings and conclusions.

We recognize that the search warrant for the content of Bollig's smartphone could provide an alternative legal ground for admitting the text messages recovered from the phone. Bollig contends the warrant was not executed within 96 hours and, therefore, became void under K.S.A. 2013 Supp. 22-2506(a). Having found Bollig's consent voluntary and otherwise sufficient to support the search of the smartphone, the district court did not consider the validity of the warrant.

The challenge to the search warrant presents interlocking questions that don't necessarily have obvious answers. For example, if a search warrant signed by a Kansas state court judge were not executed within 96 hours, does that failure render the resulting search unreasonable under the Fourth Amendment, which imposes no strict deadline? See *United States v. Jennen*, 596 F.3d 594, 600 (9th Cir. 2010) (search constitutionally reasonable despite six-day delay in executing warrant since basis for probable cause had not dissipated); *United States v. Burgess*, 576 F.3d 1078, 1096-97 (10th Cir. 2009) (Fourth Amendment does not require search warrants have expiration dates). Does it make a difference that K.S.A. 2013 Supp. 22-2506(a) voids the warrant? Cf. *United States v. Beals*, 698 F.3d 248, 264-65 (6th Cir. 2012) (suggesting search unreasonable under Fourth Amendment if county judge approving warrant lacked authority under state law to issue warrant to be executed outside that county). Courts should avoid addressing constitutional questions unnecessarily. See *Lyng v. Northwest Indian Cemetery Prot. Assn.*, 485 U.S. 439, 445-46, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988); *State ex rel.*

38

*Schmidt v. City of Wichita*, 303 Kan. 650, 658, 367 P.3d 282 (2016). We apply that admonition for judicial restraint here, since we may be able to walk around the constitutional thicket, guided by far more prosaic findings of fact and related conclusions of law the district court should have made in the first instance on the validity of the written consent to search.

Bollig's alternative argument also presents novel questions about the interplay of portions of the Kansas Code of Criminal Procedure applicable to search warrants, including K.S.A. 2013 Supp. 22-2506(a) and K.S.A. 22-2511 (no evidence suppressed because of "technical irregularities" in search warrant). The scope of any statutory remedy for an impermissible search may be an open question, as well. See K.S.A. 22-3216 (indicating evidence obtained through illegal search and seizure should be suppressed). Although the case for restraint might not be as compelling with those statutory issues, we believe the better approach to them also favors a limited remand to the district court to complete the task of making detailed findings of fact and conclusions of law on the consent to search.

On appeal, the State has asserted Bollig failed to preserve the suppression issue for review because he did not adequately object during the trial to the introduction of the text messages recovered from his smartphone. If correct, the State's position would provide an independent legal basis to uphold the district court's ruling. The Kansas Supreme Court has repeatedly recognized that the contemporaneous objection rule, codified in K.S.A. 60-404, requires a criminal defendant to make an evidentiary objection during trial to preserve for appellate review the district court's pretrial denial of a motion to suppress evidence based on a Fourth Amendment violation. *State v. Sean*, 306 Kan. 963, Syl. ¶ 1, 399 P.3d 168 (2017); *State v. Kelly*, 295 Kan. 587, 589-90, 285 P.3d 1026 (2012) (recognizing contemporaneous objection rule applies to pretrial denial of suppression of evidence on Fourth Amendment grounds).

The trial record shows that when the prosecutor offered the printout of the text messages as an exhibit during the trial, Bollig's lawyer immediately objected on the grounds of relevance, hearsay, and "the previous motions that I filed and have been ruled on." The objection was sufficiently detailed to preserve the suppression issue for review. See *State v. Barber*, 302 Kan. 367, 373-74, 353 P.3d 1108 (2015). In presenting the point in his appellate brief, Bollig did not cite that portion of the trial transcript. See Kansas Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 35) (appellant's brief to include record cite where "issue was raised and ruled on"). But we decline to find a waiver or forfeiture of the issue based on an omitted citation when the trial record readily yielded a sufficient objection. We simply had to look at the page of the trial transcript containing the State's offer of the messages as an exhibit. An appellate court is not, however, obligated to search the record, even cursorily, when a party provides an inadequate reference or citation.

*Traffic Stop Does Not Require Suppression of Evidence*

When Naomi was discharged from the Gove County Medical Center on January 31, 2014, following her miscarriage, Bollig picked her up to drive her home. In the meantime, Gove County Sheriff Allan Weber went to the hospital at the request of the KBI to get copies of Naomi's medical records. Hospital personnel told Weber they needed a release from Naomi and she had just left with Bollig. Weber went after Bollig and Naomi and intercepted them just before they got on the highway back to WaKeeney. Naomi agreed to return to the Gove County Medical Center with Weber.

On appeal, Bollig argues Weber stopped Bollig and Naomi without reasonable suspicion or probable cause, so he unreasonably seized them in violation of their Fourth Amendment rights. Bollig, then, contends the purported constitutional violation tainted evidence law enforcement officers obtained after the stop. In his brief, Bollig does not identify any particular evidence that should have been suppressed as a result. But he

40

abstractly contends he should receive a new trial as the result of the asserted constitutional violation. The failure to identify any trial evidence wrongfully admitted renders the argument legally incomplete and essentially ineffective. See *State v. Tappendick*, 306 Kan. 1054, Syl. ¶ 2, 400 P.3d 180 (2017) (failing to show how argument is sound amounts to no argument at all); *State v. Miller*, No. 109,716, 2015 WL 3632029, at *3 (Kan. App. 2015) (unpublished opinion) (defendant fails to show prejudice requiring new trial when he identifies no specific evidence admitted at trial he claims district court should have suppressed based on Fourth Amendment violation asserted in pretrial motion). We, nonetheless, take a stab at what we think Bollig may be angling at.

To start, we assume without deciding that Weber's stop of the motor vehicle in which Bollig and Naomi were travelling amounted to an unreasonable seizure violating the Fourth Amendment. We next assume that when Naomi returned to the Gove County Medical Center she signed a release for her medical records and may have provided some (unidentified) evidence. The release, the records, and any other evidence obtained from Naomi at least arguably could have been the product of her seizure during the motor vehicle stop and, based on our assumption, a violation of *her* Fourth Amendment rights. Notwithstanding all of those assumptions, that still does Bollig no good. A criminal defendant may not vicariously assert another person's Fourth Amendment rights to suppress evidence obtained from or through that person. *Plumhoff v. Rickard*, 572 U. S. ___, 134 S. Ct. 2012, 2022, 188 L. Ed. 2d 1056 (2014); *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State v. Talkington*, 301 Kan. 453, 476-77, 345 P.3d 258 (2015).

Bollig, however, may be arguing that the motor vehicle stop tainted later evidence obtained from him, such as his statements to Campbell and Eberle on February 19 and 20, the consent to search they obtained from him, and the actual search of his smartphone months later. But that theory doesn't work either.

41

Again, assuming the stop were unconstitutional, the remedy would be the suppression of any evidence obtained from Bollig as a direct result of that stop—not all evidence obtained from him at any later point in the investigation. There must be a nexus or legally recognized connection between the Fourth Amendment violation and the particular evidence to justify suppression. *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014); *United States v. Kornegay*, 410 F.3d 89, 93-94 (1st Cir. 2005). The courts commonly use the agricultural metaphor "fruit of the poisonous tree." But, as the metaphor suggests, not everything harvested in the orchard comes from the tainted tree. If the challenged evidence is sufficiently attenuated or removed from the Fourth Amendment violation, it may be used against the defendant. See *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Williams*, 297 Kan. 370, 381-82, 300 P.3d 1072 (2013). A court must determine whether government agents secured the evidence "'by exploitation of'" the violation of the defendant's Fourth Amendment rights, typically requiring suppression, or whether the evidence was "'purged of the primary taint'" of that violation, typically permitting its use at trial. *Wong Sun*, 371 U.S. at 488. The attenuation analysis depends upon the totality of the circumstances but focuses on: (1) the lapse of time between the Fourth Amendment violation and the acquisition of the challenged evidence; (2) material intervening circumstances proximately separating the violation from the acquisition; and (3) the purpose and flagrancy of the government agents' misconduct. *Brown*, 422 U.S. at 603-04; *Williams*, 297 Kan. at 381.

If Bollig seeks to exclude statements he made to Campbell and Eberle on February 19 and 20 and the text messages obtained from the smartphone the officers seized on Februrary 19 as tainted fruit of the ostensibly wrongful motor vehicle stop on January 31, he never forges a specific argument to that effect. And the circumstances demonstrate any taint from the stop had dissipated for constitutional purposes by the time he spoke with Campbell and Eberle at the WaKeeney police station.

Although Bollig was detained briefly during the motor vehicle stop, he was not questioned, accused, or arrested then. Weber fairly promptly allowed Bollig to go about his business. Nearly three weeks later, Bollig went to the police station to speak with Campbell and Eberle. At the police station, Bollig was not restrained or prevented from leaving or terminating the questioning. Indeed, Bollig left of his own accord on February 19 after signing the consents to search his smartphone and computer. We see no tangible temporal or causal connection between the motor vehicle stop and the evidence we presume Bollig means to challenge. The brief and mostly innocuous motor vehicle stop neither led to nor influenced in any constitutionally meaningful way Bollig's statements or the discovery of the text messages on his smartphone. The factual circumstances are closely aligned with those in the seminal *Wong Sun* case in which the Court found no exploitation of Wong Sun's arrest without probable cause—a Fourth Amendment violation—when Wong Sun had been promptly released on his own recognizance only to appear voluntarily at a police station for questioning several days later and then made incriminating statements. The Court held Wong Sun's statements could be used against him at trial. 371 U.S. at 491.

Bollig's argument for suppression based on the motor vehicle stop comes up short both formally and substantively.

*Conclusion*

Having reviewed the issues Bollig has raised on appeal, we decline to grant him relief at this point. His arguments based on the rule of lenity, the sufficiency of the trial evidence and the admissibility of coconspirator statements, the constitutionality of K.S.A. 2013 Supp. 21-5419, and the motor vehicle stop present no errors requiring relief. Bollig also contends the district court erred in denying his motion to suppress text messages law enforcement officers obtained in a search of his smartphone. The district court made

43

insufficient findings of fact and conclusions of law to allow adequate appellate review. We, therefore, remand to the district court with directions, as set forth at slip op. at 36-37, for the limited purpose of making additional findings of fact and supplemental conclusions of law on the suppression issue. An order of remand will follow. We otherwise retain jurisdiction of this case.

Remanded in part with directions.